UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-CR-041 |
| | ) | |
| ROBERT L. ROSE | ) | |

**MEMORANDUM AND ORDER**

This criminal case is before the Court on the defendant's December 2021 counseled motion for compassionate release pursuant to 18 U.S.C. 3582(c)(1)(A)(i). [Doc. 392]. The United States has responded in opposition [docs. 395, 396] and the defendant has submitted a counseled reply [doc. 398].

On January 28, 2022, the United States filed additional medical records. [Doc. 399]. In light of those records, the defendant filed a counseled supplemental motion for compassionate release, along with a later memorandum in support. [Docs. 400, 403].

For the reasons that follow, the defendant's motions will be denied.

**I.     BACKGROUND**

In March 2018, the Honorable Pamela L. Reeves sentenced the defendant to a net term of 295 months' imprisonment for the crimes of conspiring to distribute methamphetamine and possessing a firearm in furtherance of a drug trafficking offense. The defendant is presently serving that sentence at FCI Forrest City Low with a projected release date of April 3, 2038. *See* Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Mar. 18, 2022). He now moves for compassionate release in light of the COVID-

19 pandemic, dementia and possibly Alzheimer's disease, a seizure disorder, recent strokes, hypertension, major depressive disorder, adjustment disorder, unspecified mood disorder, his age (69), significant bilateral hearing loss, mild calcification of the arteries, and pulmonary nodules.[1]

## II. COMPASSIONATE RELEASE

Section 3582(c)(1)(A)(i) of Title 18, United States Code, allows district courts to consider prisoner motions for sentence reduction upon a finding of "extraordinary and compelling reasons." That statute, as amended by the First Step Act of 2018, provides in relevant part:

> [T]he court, upon motion of the Director of the Bureau of Prisons ["BOP"], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction ... and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission....

18 U.S.C. § 3582(c)(1)(A)(i). Prior to the First Step Act, a motion for compassionate

---

[1] The defendant also raises issues pertaining to his conditions of confinement, including the fact that he is not incarcerated at a medical facility. [Doc. 392, p. 10 ("Mr. Rose remains at a facility that is not equipped to provide adequate care for him."); p. 13 ("Mr. Rose cannot rely on trained staff to help him take his medication or protect him from exploitation from other inmates."); p. 14 ("The BOP is not providing the necessary level of care . . . ."); p. 17 ("Mr. Rose's worsening condition is not being adequately treated by the BOP . . . ."). Such claims might be cognizable, *see, e.g., Estelle v. Gamble*, 429 U.S. 97 (1976), but they should be presented in a civil lawsuit in the prisoner's district of confinement after the exhaustion of administrative remedies. *See* 42 U.S.C. § 1997e(a). There is no evidence that this defendant has exhausted his administrative remedies on those claims, nor is he incarcerated in this judicial district.

release could only be brought by the BOP Director, not a defendant. *See* 18 U.S.C. § 3582(c)(1)(A) (2017). The First Step Act amended § 3582(c)(1)(A) to allow a defendant to file a motion for compassionate release after first asking the BOP to file such a motion on his behalf. *See, e.g., United States v. Alam*, 960 F.3d 831, 832 (6th Cir. 2020).

The United States Sentencing Commission has promulgated a policy statement regarding compassionate release under § 3582(c), which is found at U.S.S.G. § 1B1.13 and the accompanying application notes. District courts in this circuit previously turned to U.S.S.G. § 1B1.13 to provide guidance on the "extraordinary and compelling reasons" that may warrant a sentence reduction but are no longer to do so, at least as to compassionate release motions filed by defendants (rather than by the BOP). *See United States v. Jones*, 980 F.3d 1098, 1108 (6th Cir. 2020) ("[H]olding" that guideline 1B1.13 "is not an 'applicable' policy statement when an imprisoned person files a motion for compassionate release."); *accord United States v. Elias*, 984 F.3d 516 (6th Cir. 2021).

In *Jones*, the Sixth Circuit observed that "[d]istrict courts should [still] consider all relevant § 3553(a) factors before rendering a compassionate release decision." 980 F.3d at 1114. Subsequently, in *Elias*, the appellate court "clarified" that "district courts may deny compassionate-release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others." 984 F.3d at 519.

A. Exhaustion

The defendant asked his warden to file for compassionate release in August 2021, and more than 30 days passed between the warden's receipt of that request and the filing of the instant motion. [Doc. 392-2]. The Court thus finds that it has authority under §

3

3582(c)(1)(A) to address the issue of compassionate release in this case. *See Alam*, 960 F.3d at 834.

B. Merits

As mentioned above, in support of his motion the defendant cites the COVID-19 pandemic, dementia and possibly Alzheimer's disease, a seizure disorder and recent strokes, hypertension, major depressive disorder, adjustment disorder, unspecified mood disorder, his age (69), significant bilateral hearing loss, mild calcification of the arteries, and pulmonary nodules.

BOP medical records confirm that the defendant has been diagnosed with, and receives treatment for, hypertension. [Doc. 392, Ex. 4]. A December 2021 CT scan of the chest showed "no acute cardiopulmonary abnormality." [Doc. 396].

"Mild to severe" hearing loss has been identified in each ear, and bilateral hearing aids were recommended in October 2021 with which "he should notice improved hearing and speech understanding." [*Id.*]. The defendant has also been diagnosed with, and receives treatment for, depression. [Doc. 392-4]. However, in July 2021 he denied any complaints pertaining to hypertension and he "denied being depressed." [Doc. 396].

The defendant has suffered a few falls during his incarceration. [Docs. 392-4, 396]. Also, in August 2020 and May 2021 he complained of "2 floaters and light flashes in my right eye for one week." [Doc. 392-4].

Memory concerns have been noted in the record. For example, in August 2020 the defendant stated that he was uncertain whether he had taken his medication that morning, and that he might have taken it twice. [*Id.*]. In April 2021, a counselor noted that the

4

defendant "did lose track of topics being discussed at one point but with little assistance he was able to resume the conversation." [*Id.*]. In January 2021, "[h]e reported some memory impairment but demonstrated clear and coherent thought process." [*Id.*].

In March 2020, the defendant claimed that "other inmates take advantage of him by stealing his medication and telling him he owes them money when he in fact does not." [*Id.*]. However, the BOP appears to have addressed that concern. In July 2020, the defendant and his cellmate reported that the defendant "is safe in his current unit which was not the case in his previous unit." [*Id.*]. In November 2021, the defendant complained only that "peers on his unit will 'mess with him,' because 'they know I can't remember well.'" [Doc. 396]. Medical providers have, however, regularly noted (September 2019; March, June, July, September, and November 2020; January, March, April, May, July, August, October, and November 2021) that the defendant is fully oriented. [Docs. 392-4, 396].

October 2020 medical records contain the notation that the defendant is "known to have dementia as listed in Mental Health Clinic medical record." [Doc. 392-4]. Secondary to the defendant's reported seizure activity and memory loss, an MRI of the brain was performed in May 2021. "Suspected small lacunar infarctions in the left cerebral hemisphere" were noted but the MRI was "otherwise unremarkable." [*Id.*].

In November 2021, the Dementia Rating Scale-2 ("DRS-2") and the Test of Memory Malingering ("TOMM") were administered. [Doc. 396]. The TOMM did not indicate malingering, and on the DRS-2 the defendant received "a severely impaired score related to Memory." [*Id.*]. Attention, Construction, and Conceptualization scored in the

5

below average but intact range, and Initiation and Perseveration were only mildly impaired. [*Id.*]. The defendant "received a moderately impaired Total Score, corroborating [his] self report of memory impairment, which impacts his daily functioning." [*Id.*].

On August 8 and September 30, 2020, "possible seizure activity" was noted. [Doc. 392-4]. August 8 was the date that the defendant speculated he might have taken his medication twice. There were "[n]o signs of illegal drug usage" that day. [*Id.*]. On October 3, 2020, a guard reported that the defendant "was totally disoriented in the unit early this morning and had brown stains on fingertips." [*Id.*]. The defendant denied having smoked any illegal substance. [*Id.*]. As of July 2021, medical records deemed this issue resolved. [Doc. 396].

In January 2022, however, the defendant suffered what BOP records term an "acute stroke." [Doc. 399]. A facial droop was noted, and the defendant was at that time unable to move his left side. [*Id.*]. The Court has no subsequent documentation regarding this episode but, according to counsel, "at least as of January 24, 2022, it appears Mr. Rose has mostly recovered and, so far, avoided any permanent complications or disabilities." [Doc. 400, p. 2].

The BOP categorizes the defendant as a Care Level 2 inmate in terms of his physical health, and Care Level 1 as to mental health. [Doc. 392-3]. "Care Level 2 inmates are stable outpatients who require clinician evaluations monthly to every 6 months. Their medical . . . conditions can be managed through routine, regularly scheduled appointments with clinicians for monitoring. Enhanced medical resources, such as consultation or evaluation by medical specialists, may be required from time to time." *See*

6

http://www.bop.gov/resources/pdfs/care_level_classification_guide.pdf (last visited Mar. 18, 2022). "Care Level 1 inmates are less than 70 years of age and are generally healthy. They may have limited medical needs that can be easily managed by clinician evaluations every 6 to 12 months." *Id.* The defendant is not housed at a medical facility.

For purposes of the instant motions only, the Court will *presume*, without deciding, that the defendant has shown extraordinary and compelling reasons for compassionate release. He has not, however, shown that his release would be consistent with the 18 U.S.C. § 3553(a) factors, and for that reason his motions will be denied. Pursuant to § 3553(a),

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider –
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>
> > (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines—
> >
> > > (i) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such

guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; . . .

. . .

(5) any pertinent policy statement—

(A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

(B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In this case, the defendant led a large methamphetamine distribution conspiracy between January 2014 and April 2017. [Doc. 294, ¶¶ 21-22]. He would obtain kilogram quantities of methamphetamine for distribution in this district. [*Id.*, ¶ 22]. On just one occasion, a search of his bedroom discovered approximately one kilogram of the drug along with 26 grams of cocaine. [*Id.*, ¶ 25]. Pursuant to the terms of his plea agreement, he was held accountable for what is clearly a conservative quantity of at least 1.5 kilograms but less than 4.5 kilograms of methamphetamine. [*Id.*, ¶ 26]. The defendant admittedly

8

Case 3:17-cr-00041-RLJ-DCP   Document 404   Filed 03/23/22   Page 8 of 12   PageID #: 3483

possessed four firearms in furtherance of his drug trafficking crimes. [*Id.*, ¶ 21].[2] One of his codefendants was also his nephew. [*Id.*, ¶ 32].

This case is unusual in that the defendant's criminal history did not begin until age 60 or 61. [*Id.*, ¶ 61]. He reports suffering multiple injuries in a car accident in 2013, leading to daily usage of methamphetamine. [*Id.*, ¶¶ 72, 74; doc. 392, p. 2]. These facts are certainly unfortunate.

The Court notes that the defendant has incurred only one minor disciplinary sanction while in BOP custody, for giving or accepting money without authorization. [Doc. 392, Ex. 3]. He has participated in a small amount of rehabilitative programming, including a 12-hour nonresidential Drug Abuse Education Course. [*Id.*]. The BOP has scored the defendant as having a minimum risk of recidivism, and he has a low security classification. [*Id.*].[3]

In addition to the defendant's generally good conduct at the BOP, the Court has of course considered his medical conditions. However, those issues are outweighed by the nature and circumstances of the instant offenses, and by the defendant's failure to provide a suitable release plan.

As mentioned, the defendant led a substantial methamphetamine distribution conspiracy, and went armed in furtherance of that conspiracy, from 2014 to 2017. He accomplished his crimes despite admittedly suffering memory issues secondary to the 2013

---

[2] In February 2019, the defendant boasted to this Court that he "is and has been a 'gun lover'" who "comes from a 'gun loving' family and geographical area." [Doc. 337, p. 12].

[3] As explained below, this Court does not agree with the BOP's recidivism assessment.

9

motor vehicle accident.  Letters submitted prior to sentencing illustrate that point.  The defendant's daughter wrote that by 2013 or 2014 she had noticed "a big change in his thought process." [Doc. 308, Ex. 2].  His wife wrote, "Since his accident, he had a lot of memory problems/loss …." [*Id.*, Ex. 3].  The defendant wrote that since his accident "my short-term memory has been extremely bad," and he blamed his nephew for "approach[ing] me with the idea of selling the stuff [methamphetamine]." [Doc. 307, Ex. 1].  He also wrote that he could not remember a prior attorney's last name, "[l]ike about 1,000 other things I can't remember[.]" [*Id.*].

The defendant now has a formal diagnosis of moderate dementia-related impairment, based largely on his memory issues.  Those issues, however, were insufficient to prevent him from leading a large-scale methamphetamine conspiracy while armed, purportedly due to the bad influence of a close family member.  The Court also notes that, despite his memory problems, the defendant was able to file a *pro se* motion under 28 U.S.C. § 2255 in April 2019, and he was able to vigorously litigate that motion. [Case No. 3:19-cv-057].

Importantly, it is further apparent that the defendant lacks a suitable release plan were he to leave prison.  An acceptable release plan is critical not only for a defendant's health and safety, but also to provide stability to deter future criminal conduct.

The defendant has attached a letter from counsel to the BOP which claims that "[w]e also have an adequate release plan for Mr. Rose, who would be able to live with one of his children . . . ." [Doc. 392, Ex. 2].  The specifics of that plan, however, were not initially made a part of the record in this case.  As such, the Court entered an order on February 1, 2022, holding the case in abeyance pending the defendant's filing of his release plan. [Doc.

10

401]. Defense counsel filed that plan the following day, stating that the defendant would reside with his son. [Doc. 403].

At the Court's request, the United States Probation Office conducted a home inspection of that proposed release address. Upon inspection, the officers found the defendant's release plan to be completely unsuitable. The undersigned has reviewed the probation office's report and agrees that the defendant's proposed release plan is unacceptable. The plan is not at all as described by counsel. It is insufficient to support the defendant's medical needs, is plainly unstable, and is inadequate to protect the public from future crimes by this defendant. As defense counsel acknowledges, the defendant's bad conduct began when he moved into an inappropriate residence with a close family member. [Doc. 392, p. 2].

Judge Reeves imposed a sentence at the bottom of the applicable guideline range in this case, in part due to the defendant's memory loss and depression. [Doc. 317, p. 52]. On appeal, the Sixth Circuit affirmed that sentence as substantively and procedurally reasonable due to, *inter alia*, Judge Reeves' articulated consideration of the 3553(a) factors. [Doc. 329]. That sentence remains appropriate in this case.

The defendant's crimes were extremely serious. His memory problems were not so severe as prevent him from planning and committing those crimes. He has served only a small fraction of his sentence. *See United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (Several § 3553(a) factors "permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."). Compassionate release on the facts of this case would not reflect the seriousness of the offenses of

11

conviction, would not promote respect for the law or provide just punishment, and would not afford adequate deterrence or protect the public from future crimes of this defendant.

## IV. CONCLUSION

As provided herein, the defendant's motions for compassionate release [docs. 392, 400] are **DENIED**.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge

12

Case 3:17-cr-00041-RLJ-DCP   Document 404   Filed 03/23/22   Page 12 of 12   PageID #: 3487